**Tagged for publication**

ORDERED in the Southern District of Florida on ___Feb 18, 2015___



_____
John K. Olson, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

**DAVID F. DAMERAU,**                     Case No. 12-33800
                                          Chapter 7

       **Debtor.**

_____

## ORDER ON MOTION TO RECUSE

This case is before the Court without a hearing on the Debtor's *pro se* Motion (the "Recusal

Motion") [ECF 380] and Affidavit [ECF 381] in Support to Recuse Presiding Judge. The Recusal

Motion seeks an order of recusal of this judge pursuant to 28 U.S.C. §§ 455(a) and (b), 28 U.S.C.

§ 144, and Federal Rule of Bankruptcy Procedure 5004(a).

### Disqualification under 28 U.S.C. § 144

The Debtor seeks disqualification under 28 U.S.C. § 144, which provides that

> Whenever a party to any proceeding in a district court makes and files a
> timely and sufficient affidavit that the judge before whom the matter is pending has
> a personal bias or prejudice either against him or in favor of any adverse party, such

judge shall proceed no further therein, but another judge shall be assigned to hear
such proceeding.

By its express terms, § 144 applies only to proceedings "in a district court" and is inapplicable to

proceedings before a bankruptcy judge.[1] *Dubnoff v. Goldstein*, 385 F.2d 717. 720 (2d Cir. 1967);

*Ginger v. Cohn*, 255 F.2d 99 (6th Cir. 1958); *Seidel v. Durkin (In re Goodwin)*, 194 B.R. 214, 221

(9th Cir. BAP 1996); *In re Syntax-Brillian Corp.*, 400 B.R. 20 (Bankr. D. Del. 2009). Federal Rule

of Bankruptcy Procedure 5004(a) expressly provides that the recusal of bankruptcy judges is

governed by 28 U.S.C. § 455, and by negative implication, not by § 144. This Court has previously

addressed this question and concluded that § 144 does not apply to bankruptcy judges. *In re Hussey,*

391 B.R. 911, 918 (Bankr. S.D. Fla. 2008).[2]

Accordingly, to the extent that the Recusal Motion seeks recusal under 28 U.S.C. § 144, it

is **DENIED.**

## Disqualification under 28 U.S.C. § 455(b)

Disqualification under § 455(b)(1) requires a judge to disqualify himself or herself where he

or she "has a personal bias or prejudice concerning a party, or personal knowledge of disputed

evidentiary facts concerning the proceeding." The Debtor makes no allegation that this Court has

"personal knowledge of disputed evidentiary facts concerning the proceeding," and the "personal

knowledge" basis for recusal requires no further analysis.

In *Liteky v. United States*, 510 U.S. 540, 554-55 (1994), the Supreme Court held that "[b]ias

---

[1]Section 144 is similarly inapplicable to federal appellate judges. *Pilla v. American Bar
Ass'n,* 542 F.2d 56 (8th Cir. 1976).

[2]The Court is aware of no case which holds that a bankruptcy judge is required to recuse
himself or herself under § 144.

against a litigant must ... arise from an extrajudicial source" for disqualification under § 455(b)(1),
*Hook v. McDade*, 89 F.3d 350, 355 (7th Cir. 1996). Adverse orders and other judicial rulings in the
same case are insufficient by themselves to establish bias for disqualification under § 455(b)(1).
Opinions formed in the course of the judicial proceedings are "nearly exempt from causing recusal,"
and can only do so if they "reveal such a high degree of favoritism or antagonism as to make fair
judgment impossible." *Andrade v. Chojnacki*, 338 F.3d 448, 462 (5th Cir. 2003). As held by the
Fifth Circuit, even a trial judge's insults and expressions of distaste for a party were not enough to
meet this high standard because "expressions of impatience, dissatisfaction, and even anger" will not
establish the bias or prejudice required by § 455(b)(1). *Id. (citing Liteky*, 510 U.S. at 555-56).

    Disqualification under § 455(b)(1) requires that a litigant present evidence of a "negative bias
or prejudice [which] must be grounded in some personal animus or malice that the judge harbors
against him." *United States v. Balistrieri*, 779 F.2d 1191, 1201 (7th Cir. 1985). The standard for
determining if such bias exists is "whether a reasonable person would be convinced the judge was
biased." *Hook*, 89 F.3d at 355. This standard for finding actual bias is objective, and that "it is with
reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive,
cynical and suspicious person' that the objective standard is currently established." *Andrade*, 338
F.3d at 458.

    This Court is satisfied that a reasonable, well-informed, thoughtful and objective person
could not conclude from a careful review of the entire record in this case that this judge has some
personal animus or malice toward the Debtor, let alone that such bias has been established "by
compelling evidence," *Brokaw v. Mercer County*, 235 F.3d 1000, 1025 (7th Cir. 2000).

    Accordingly, to the extent that the Recusal Motion seeks recusal under 28 U.S.C. § 455(b)(1),

it is **DENIED.**

## Disqualification under 28 U.S.C. § 455(a)

Section 455(a) requires disqualification for the *appearance* of partiality (*i.e.,* when a judge's "impartiality might reasonably be questioned") as compared to § 455(b)(1), which requires disqualification for *actual* partiality (*i.e.,* when a judge "has a personal bias or prejudice toward a party"). Whether the judge is, in fact, impartial is determinative of disqualification under § 455(b)(1), but it is not dispositive for determining disqualification under § 455(a). The justification for making perceived partiality a grounds for disqualification is at least two-fold. First, regardless of whether judges are partial in fact, public perceptions of partiality can undermine confidence in the courts. Second, disqualifying judges for outward manifestations of what could reasonably be construed as bias obviates making subjective judgment calls about what is actually going on in a judge's heart and mind.

Congress made clear in its 1974 amendments to § 455(a) that judges should apply an objective standard in determining whether to disqualify, that is, whether a judge's impartiality might be questioned from the perspective of "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought." *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1524 (11th Cir. 1988). In denying a motion for his disqualification from *Cheney v. United States District Court for the District of Columbia,* Justice Scalia noted that the recusal inquiry must be "made from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and circumstances.*" 541 U.S. 913, 923 (2004) (mem.) (Scalia, J.) (citing *Microsoft Corp. v. United States,* 530 U.S. 1301, 1302 (Rehnquist, C.J., respecting recusal) (emphasis added by Justice Scalia) (citing *Liteky v. United States,* 510 U.S. 540, 548 (1994). The Second Circuit has

4

characterized the reasonable person as an "objective, disinterested observer" who is privy to full knowledge of the surrounding circumstances. *United States v. Bayless*, 201 F.3d. 116, 126 (2nd Cir. 2000).

Prior to the 1974 amendments, in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), the Supreme Court held that "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source ... other than what the judge learned from his participation in the case. *Id.* at 583. The "extrajudicial source" doctrine stems from the common-sense view that ordinarily, the circumstances suggesting or creating the appearance of partiality cannot reasonably be derived from information learned by the judge in the normal course of litigation. It is natural for judges to form attitudes about litigants and issues as the facts of a case unfold, and no reasonable person would question the impartiality of judges who do. As the Supreme Court explained in *Liteky*, 510 U.S. at 550-51:

> The judge who presides at trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

Although disqualification for bias as the result of information from an extrajudicial source "is the only *common* basis" for disqualification, it is "not the *exclusive* one." *Id.* at 551. The Supreme Court referred to two different scenarios when disqualification appropriately follows from remarks made during judicial proceedings: when the remarks reveal an extrajudicial bias, and when the remarks reveal an excessive bias arising from information acquired during judicial proceedings. As the Court explained, *Id.* at 555:

5

> Judicial remarks during the course of a trial that are critical or disapproving of, or
> even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias
> or partiality challenge. They *may* do so if they reveal an opinion that derives from
> an extrajudicial source; and they *will* do so if they reveal such a high degree of
> favoritism or antagonism as to make fair judgment impossible.

The Court emphasized that the latter form of bias – one that arises from what the judge learns in the

courtroom – must be truly excessive to warrant disqualification, *Id.*:

> A favorable or unfavorable predisposition can also deserve to be characterized as
> "bias" or "prejudice" because, even though it springs from the facts adduced or the
> events occurring at trial, it is so extreme as to display clear inability to render fair
> judgment.

It is accordingly appropriate to examine each of the "incidents of misconduct" alleged by the

Debtor in ¶¶ 6 a-h in the Recusal Motion to have occurred in this case.

## 6(a).    "Personal disparaging statements against the debtor's first attorney Steven Friedman."

Unfortunately, Mr. Friedman handled the Debtor's case in an incompetent manner. The

Debtor's case was filed October 3, 2012. Neither the Debtor nor Mr. Friedman appeared at the

meeting of creditors statutorily required by 11 U.S.C. § 341, prompting the United States Trustee

to move [ECF 19] for dismissal of the case. Mr. Friedman responded [ECF 20] that he had

"improperly calendared the Meeting of Creditors." The Chapter 11 Case Management Summary

[ECF 56], required by Local Rule 2081-1(B)(2) to be filed within three business days after the case

was filed, was not filed until November 28, 2012, more than six weeks late. The basic documents

required to be filed by every debtor were not timely filed, and when filed, were incomplete. Indeed,

at a hearing on November 28, 2012, Mr. Friedman represented [ECF 103, page 15 of 33] to the Court

that

> ...at the last hearing we had, you instructed me to be sure to get whatever documents
> Mr. Damerau needed to have filed, filed, I think we have submitted everything that

6

the U.S. Trustee's Office needs at this point, Mr. Damerau set up his DIP account, all schedules and statements are filed ....

In fact, as of that date, the Debtor had not filed the required Statement of Financial Affairs (then some six weeks overdue) and had not filed the required certificate of credit counseling required by 11 U.S.C. § 109(h)(1).

The Debtor's case was converted to a case under Chapter 7 at the request [ECF 22] of a creditor, FPH Properties, LLC, following the hearing on November 28, 2012. The United States Trustee had previously moved [ECF 19] to dismiss the case for the Debtor's failure to appear at the § 341 meeting. Under the provisions of 11 U.S.C. § 1112(b)

> on request of a party in interest, and after notice and a hearing, the court *shall* convert a case under [Chapter 11] to a case under chapter 7 or dismiss a case under [Chapter 11], whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment ... of a trustee or an examiner is in the best interests of creditors and the estate. [Emphasis added.]

At the November 28th hearing, the United States Trustee advised the Court that it did not oppose conversion of the Debtor's case to a case under Chapter 7.

It developed at that hearing that Mr. Friedman had filed a Suggestion of Bankruptcy in a state court foreclosure case brought by Comerica Bank against NationStorage, a company or companies owned by Mr. Damerau. NationStorage itself had not filed a bankruptcy petition. Mr. Friedman's stated theory at the hearing for the proposition that Mr. Damerau's personal Chapter 11 filing operated as an automatic stay of that foreclosure case was as follows:

> The legal authority would be that Mr. Damerau owned 100 percent interest in the stock of Nationstorage, and based on my reading of Section 362, the stay should apply.

[ECF 103, page 22, line 23 through page 24, line 24]. This theory is utterly inconsistent with

7

bankruptcy law, and Mr. Friedman was unable to provide a single case which stands for this proposition. Section 362(a)(1) stays actions "against the debtor" but does not protect entities owned by a debtor without separate order of the bankruptcy court entered after notice and a hearing. *See generally, Bloomberg Bankruptcy Treatise* Chapter 45(C)(2) (Bloomberg BNA 2015); *see generally, Collier on Bankruptcy* ¶ 362.03[3][d] (16th ed.)

Mr. Friedman sought to withdraw as counsel for the Debtor by motion [ECF 73] filed December 6, 2012. The Chapter 7 Trustee, Leslie S. Osborne, objected [ECF 81], noting that Mr. Friedman

> has never filed an application to be employed in this case nor has any employment been granted. As such, counsel should not be allowed to withdraw until such time as he repays any and all funds received from the Debtor in this case.

Trustee Osborne also requested that "the Debtor should be required, with his counsel, to file all required documentation before counsel is allowed to withdraw." The Court authorized withdrawal by Order [ECF 93] which, "upon the agreement between Steven H. Friedman, Esq. and the Chapter 7 Trustee," permitted Mr. Friedman's withdrawal as counsel upon his disgorgement to the Trustee of the $5,000 retainer which he had been paid by the Debtor.

In sum, Mr. Friedman's representation of the Debtor was incompetent. The Court reached that conclusion solely as a result of observing Mr. Friedman's handling of the case.

## 6(b).   The Court "called the debtor's subsequent attorney David Harris a 'chump.'"

David Harris had represented the Debtor in other matters prebankruptcy, but never appeared in court for the Debtor in this case. The Debtor never sought to retain Mr. Harris in this case and Mr. Harris never filed a notice of appearance in this case on behalf of the Debtor.

Mr. Harris did appear at a single hearing in this case held August 8, 2014, but on his own

8

behalf, not on behalf of the Debtor. To understand why he appeared requires a journey into the strange litigation practices of the Debtor and his disputes with FPH Properties, LLC, his most significant creditor, with whom the Debtor had been in highly contentious litigation for many years. Some of the background of that litigation is set forth in Section 6(c) below.

In July 2013, FPH entered into a Settlement Agreement with Trustee Osborne. Some of the issues relevant to understanding that settlement are discussed in Sections 6(e) and 6(f) below. The Trustee's Motion [ECF 219] to approve the Settlement Agreement was filed August 1, 2013. Under the Settlement Agreement, FPH agreed to pay $25,000 to the Trustee in order to fund the administration of this otherwise administratively insolvent estate. In exchange, FPH agreed to undertake the investigation and litigation of claims under Part V of the Bankruptcy Code (including preferences, fraudulent transfers, etc.), the Trustee agreed to retain FPH's counsel to handle potential litigation, and the parties agreed to a split of litigation recoveries 80% to FPH and 20% to the estate. Among other things, the Settlement Agreement provided that FPH would have a continuing option "to purchase for $1 any asset or company in the Bankruptcy Estate that the Trustee determines will not cause the Bankruptcy Estate more than a de minimis negative tax consequence upon sale."[3]

The Debtor objected [ECF 229] to the Settlement Agreement. That objection to the Settlement Agreement was overruled and the Settlement Agreement approved by Order [ECF 257] entered October 16, 2013. The Debtor never appealed from that Order and it is long-since final.

Pursuant to the terms of the approved Settlement Agreement, the Trustee conveyed the Debtor's 100% ownership interest in two corporate entities, NationStorage, Inc., and NationStorage

---

[3]The absence of tax returns for the Debtor's many entities was a continuing problem for the administration of the estate and is discussed in some detail in Section 6(d) below.

9

REIT, Inc., to FPH. In an effort to thwart subsequent state court litigation brought by FPH to enforce

its rights over the NationStorage entities and their assets, the Debtor suborned Mr. Harris to act as

his catspaw. The scheme was complex.

First, the Debtor prepared a fraudulent UCC-1 Financing Statement. The purported collateral

covered by the Financing Statement is

> All Corporate and Shareholder Interests owed [sic] from 9-20-2009 by DFD Capital
> Development Cortp and David Damerau, Indivigually [sic], 100% shareholder
> interests in the companies as follows, Glen Meadows Townhomes, LLC, Rolling
> Hills Estates LLC, Pierce Street Properties LLC, Nationstorage REIT 1,
> Nationstorage Inc, Eastside Development Contractors Inc, and any additional future
> shareholder interests, shall be held as collateral and security for the extension of
> credit.

[ECF 293-1, 293-4]. The purported secured creditor shown on the Financing Statement is Gaddis

Capital Corp. ("Gaddis"), an entity controlled by Jesse Gaddis, an acquaintance of the Debtor.[4] In

fact, the shareholder interests owned the Debtor as of the petition date were property of the

bankruptcy estate and had not, in fact, ever been pledged to Gaddis. There is no Security Agreement

granting a lien on those shareholder interests to Gaddis. The Debtor provided an *unrecorded* copy[5]

of the UCC-1 Financing Statement [ECF 293-4] to Mr. Harris. The Debtor then falsely told Mr.

Harris that he had been retained by Gaddis to protect its "security interest" in the NationStorage

---

[4]Although Gaddis was listed in the Debtor's Amended Schdules [ECF 149], filed
February 15, 2013, as a secured creditor in the amount of $4.5 million and an unsecured creditor
in the amount of $2,791,666.867, Gaddis never filed a Proof of Claim in the Debtor's case. The
bar date for the filing of claims was October 16, 2013.

[5]The Debtor actually did file the UCC-1 Financing Statement on January 3, 2013, exactly
3 months after the Debtor's voluntary petition was filed. The recorded UCC-1 is in the record at
ECF 293-1. The filing of a Financing Statement and any other attempt to lien or otherwise
convey property of the estate post-petition is avoidable by the Trustee under 11 U.S.C. § 549.
Here, no actual security interest was granted and the Debtor's actions were void.

10

entities and their assets. Armed with this assurance, *but never having spoken to a single representative of Gaddis* about the supposed retention, let alone having been hired by Gaddis to represent it in that or any other legal matter, Mr. Harris filed pleadings in state court asserting Gaddis' (nonexistent) security interest in the NationStorage assets so as to prevent FPH from exercising control over them. The entire charade was part of the Debtor's efforts to thwart FPH's exercise of the rights in NationStorage that it had purchased from the Trustee.

The Trustee and FPH jointly moved for a finding of contempt against Gaddis and Mr. Harris by Motion [ECF 293] filed May 21, 2014, and that motion was heard by the Court on August 8, 2014. When the issues involving the UCC-1 and Mr. Harris' purported representation of Gaddis came to light, Gaddis hired its own counsel and immediately disavowed having filed the UCC-1, disavowed that Mr. Harris had been authorized to represent Gaddis in that or any other matter, and apologized to FPH and the Court. The Court ruled by Order [ECF 332] that

Gaddis Capital Corporation is not in contempt of court. The actions taken in its name were not authorized by Gaddis Capital Corporation and it bears no responsibility for anything that occurred in connection with this matter.

The 109 page transcript of the August 8th hearing is at ECF 346. The Court concluded as a result of Mr. Harris testimony, which appears in many places in the August 8th transcript [ECF 346], that Mr. Harris had been "a chump" in undertaking representation without ever speaking to the purported client and without authorization from that client, based solely on the Debtor's fraudulent representations.

The Debtor's contention that Mr. Harris was "the debtor's subsequent attorney" is not true. Mr. Harris appeared at the August 8th hearing on his own behalf; the Debtor appeared at that hearing *pro se.* Based upon Mr. Harris' testimony at the August 8th hearing, this Court concluded that Mr.

11

Harris had been a chump to act as he did, and sanctioned him $1,000 payable to the Trustee for the benefit of the estate by Order [ECF 332]. The sanction was imposed to compensate the estate in part for the expense to which it had been put as a result of Mr. Harris' unauthorized actions. No appeal was taken from that Order. To the best of the Court's knowledge, it has never before or since met Mr. Harris, and the Court's expressed opinion regarding his chumpness was based solely upon the evidence adduced at the August 8th hearing.

**6(c). The Court "falsely called the debtor DAVID DAMERAU a 'liar' in one of the case hearings."**

The Debtor does not disclose when or in what connection the Court called him a liar. The only occasion of which the Court is aware that it stated on the record that the Debtor was lying in his testimony is discussed below. The Court has, as a result of the litigation before it in the Debtor's main bankruptcy case and in Adversary Proceeding 13-1246-JKO, *FPH Properties, LLC v. David F. Damerau,* certainly formed the opinion that the Debtor is not credible. That conclusion was similarly reached in prior litigation in state court and is binding on this Court as a matter of collateral estoppel and stipulation of the parties as to the matters litigated there, and was independently reached by this Court in the course of the litigation here.

In prior litigation in the Circuit Court for the Seventeenth Judicial Circuit, Broward County, Florida, in Case No.06-09583 (21), *FPH Properties LLC v. 22nd Century Properties, LLC and David Damerau,* the Circuit Court found in relevant part in an Amended Final Judgment entered September 4, 2012:

> Damerau and 22[nd] Century[6] created fictitious contracts, settlement statements and distribution statements which were intended to and did defraud FPH from its

---

[6] 22nd Century Properties, LLC, was solely owned and managed by the Debtor.

12

rightful share of the Company's[7] profits regarding [two homes]. Damerau and 22nd Century further failed and refused to transfer 1241[8] to the Company. Instead, Damerau and 22nd Century have deprived the Company of its property; Damerau has converted 1241 to his own use; and FPH has been damaged.

> This court ... does not find the testimony of David Damerau credible. This court further finds Defendants, 22nd Century and Damerau, breached their agreement with FPH, breached their fiduciary duties to FPH and perpetrated a fraud against FPH. ... This court further finds FPH is entitled to punitive damages.

The Circuit Court's Amended Final Judgment was affirmed by the Fourth District Court of

Appeals in Case No. 4D12-3420 by Order entered June 19, 2014, and is now final.

By Joint Submission of Facts and Issues Established by Collateral Estoppel [ECF 107 in Adv.

Pro. 13-1246], FPH and the Debtor stipulated as follows:

> 16. Damerau and 22[nd] Century created fictitious contracts, settlement statements, and distribution statements which were intended to and did defraud FPH from its rightful share of the Company's profits regarding the properties.

> 19. 22nd Century and Damerau breached their Agreement with FPH, breached their fiduciary duties to FPH and perpetrated a fraud against FPH.

> 23. The actions of Damerau and 22nd Century satisfied the elements of Florida law regarding the imposition of punitive damages.

> 28. Damerau's trial testimony was not credible.

At a hearing held in Adversary Proceeding 13-1246 on January 15, 2015, the Debtor's

counsel stipulated on the record that each of the foregoing facts (among many others) were binding

on this Court as a matter of collateral estoppel. The Debtor has sought to withdraw from the Joint

---

[7]The "Company" was Fort Lauderdale Homes, LLC, an entity jointly owned by FPH and the Debtor and managed by the Debtor.

[8]1241 Middle River Drive, Fort Lauderdale, has been claimed by the Debtor as his homestead and is the *res* in dispute between FPH and the Debtor in Adversary Proceeding 13-1246.

Submission [ECF 110, 112]. FPH asserts [ECF 111] that even if the Debtor were allowed to withdraw from the Joint Submission, he would still be bound by the stipulations made by his counsel[9] on the record, "even if the actions allegedly were taken without consulting with the client or against the wishes of the client" [ECF 111], citing, among other cases, *In re Banderas,* 236 B.R. 841, 846 (Bankr. M.D. Fla. 1999) and *In re Superior Air Parts, Inc.,* 486 B.R. 728, 735, 738 (Bankr. N.D. Tex. 2012). The Court will rule upon the collateral estoppel effects of the Joint Submission and the stipulations made on the record on January 15, 2015, in a separate order, but for purposes of the Recusal Motion, it is sufficient to note (a) that the Circuit Court for Broward County has found the Debtor to be a fraudster and not credible in a Final Judgment affirmed on appeal; and (b) that this Court similarly has found the Debtor to be not credible.

At the hearing held August 8, 2014, discussed above, curious questions arose concerning a UCC-1 Financing Statement [ECF 293-1, 293-4] which the Debtor had filed with the Florida Secured Transaction Registry on January 3, 2013, which purported to show Gaddis Capital Corp as the Secured Party. The evidence adduced at the hearing established that Gaddis had no part in the filing of the UCC-1, that the Debtor had provided it to Mr. Harris under the circumstances described above, and that the Debtor filed the UCC-1 in an attempt to indicate that certain assets owned by the Debtor and DFD Capital Development Corp. were subject to a security interest held by Gaddis. The purported collateral covered by the Financing Statement is

All Corporate and Shareholder Interests owed [sic] from 9-20-2009 by DFD Capital

---

[9]FPH asserts [ECF 111, note 1, in Adv. Pro. 13-1246] that the Debtor "has retained and discarded at least 24 different attorneys during the course of litigation with FPH in the State Court and in this Court," lists them on an exhibit, and notes that "Debtor's current counsel has now moved to withdraw as well. (ECF No. 374)." That counsel's motion [ECF 374] was heard February 17, 2015, and granted over the objection [ECF 388] of FPH.

Development Cortp and David Damerau, Indivigually [sic], 100% shareholder interests in the companies as follows, Glen Meadows Townhomes, LLC, Rolling Hills Estates LLC, Pierce Street Properties LLC, Nationstorage REIT 1, Nationstorage Inc, Eastside Development Contractors Inc, and any additional future shareholder interests, shall be held as collateral and security for the extension of credit.

The shareholder interests owned by the Debtor as of the petition date were property of the bankruptcy estate and had not, in fact, ever been pledged to Gaddis. There is no Security Agreement granting a lien on those shareholder interests to Gaddis. The Debtor provided an unrecorded copy of the UCC-1 Financing Statement [ECF 293-4] to Mr. Harris, falsely telling Mr. Harris that he had been retained by Gaddis, in an effort to prevent FPH from exercising certain rights with respect to the NationStorage entities.[10]

The Debtor's testimony with respect to the Financing Statement and his communications with Mr. Harris [ECF 346, transcript of August 8, 2014 hearing] was incredible and unbelievable. A fair reading of that hearing transcript, which the Court has reread in connection with ruling on the Recusal Motion, leads to an inescapable conclusion that the Debtor attempted a fraud on his bankruptcy estate and on the Court by his filing of the fraudulent UCC-1. As set forth in the transcript, the Court told the Debtor [ECF 346, page 46, line 24 through page 47, line 3] that "I don't believe that you are being perfectly honest with me, Mr. Damerau" and "I think you are lying." Later in the hearing [ECF 346, page 68, lines 11-12], the Court stated that "I think you're perpetrating a significant fraud here, Mr. Damerau." These conclusions were reached solely on the basis of the evidence presented. The Court did not use the word "liar" to describe the Debtor, but has formed

[10]As discussed in Section 6(b) above, the Trustee had assigned those stock interests to FPH pursuant to a Settlement Agreement dated July 19, 2013, approved by the Court by Order [ECF 257] and Order [ECF 278].

an unfavorable opinion of the Debtor's credibility based solely upon the litigation before the Court.

**6(d). The Court threatened to hold the Debtor in contempt for failing to prepare and file tax returns for his various entities.**

A recurring theme throughout this case has been the Trustee's difficulty in obtaining documents from the Debtor. Some of that history is outlined above.

By Motion (the "Tax Return Motion") [ECF 275] to compel the Debtor to file tax returns, filed November 26, 2013, Trustee Osborne sought entry of an order compelling the Debtor to file tax returns for himself and for multiple corporate entities owned by him "so the Trustee can determine whether any estate tax liability exists arising from the numerous business entities owned by the Debtor." The Trustee identified some 17 business corporations and limited liability companies as to which no tax returns had been filed – let alone provided to the Trustee – over multiple tax years. Following a hearing on the Motion held January 7, 2014, the Court granted the Motion by Order (the "Tax Return Order") [ECF 281] entered January 16, 2014, which directed the Debtor "to file all outstanding tax returns, both personal and corporate, with the IRS and submit a copy to the Trustee," all by March 15, 2014.

By Motion (the "Tax Return Contempt Motion") [ECF 292] filed by the Trustee on May 20, 2014 – more than two months after the March 15th deadline – the Trustee sought entry of an order holding the Debtor in contempt for failure to comply with the Tax Return Order. The Tax Return Contempt Motion represented that

despite being provided an additional two months after the Court ordered deadline, the Debtor has only filed 8 tax returns and has failed to file 87 tax returns. Moreover, the Debtor has failed to file any tax returns for 11 of the Debtor's entities. [Footnote omitted.]

In his *pro se* response [ECF 302], the Debtor asserted that he had "attempted in good faith to comply

16

with the Court's imposed 2-month deadline," asserted that 61 tax returns had been completed,[11] and that of the 87 missing returns, "at least 4" were not required.

At the Debtor's request [ECF 303], the Court rescheduled the Tax Return Contempt Motion from June 10, 2014 [ECF 296] to August 8, 2014. On July 18, 2014, the Debtor filed a Motion [ECF 317] seeking a further extension of the deadlines for the filing of the "approximately 13 tax returns [which] are still outstanding." The Debtor served Notice [ECF 323] on July 25, 2014, that he had filed certain of the outstanding returns. At the hearing on August 8th, the Tax Return Contempt Motion and the Debtor's Motion for a further extension of time were continued to October 1, 2014. The Court finally entered an Order (the "Contempt Order") [ECF 350] on November 6, 2014, finding that the Debtor was in contempt for his failure to file and serve the missing tax returns and granted the Trustee other relief in connection with the information required to file the estate's tax returns. No contempt sanctions were imposed upon the Debtor in that or any subsequent order. The Contempt Order was entered almost a year after the Tax Return Motion had been filed and 10 months after the Tax Return Order was entered. The Contempt Order was entered after the Debtor repeatedly sought, and was granted, extensions of time, and almost six months after the Trustee sought entry of an order finding the Debtor in contempt. The Court is satisfied that the entry of the Contempt Order was entirely justified in the circumstances.

## 6(e).   The Court "permitted the assets of the Debtor DAVID DAMERAU worth several millions of dollars to be sold for $1 to FPH, etc."

The Debtor's Amended Schedule A lists two parcels of real property. The first, 1241 Middle River Drive, Fort Lauderdale, is asserted in Amended Schedule A to be worth $1,650,000. It is

---

[11]The Debtor's *pro se* response [ECF 302] does not allege how many of the 61 completed returns had been filed with the IRS.

discussed in § 6(f) below. The second, a boat dock in Lighthouse Point owned jointly with the Debtor's mother, is asserted to be worth $25,000. The boat dock is the subject of an adversary proceeding [Adv. Pro. 14-1855] brought by the Trustee to sell the property under 11 U.S.C. § 363(h) and to partition the property under *Fla. Stat.* § 64.011, *et seq.* No rulings have been made in that Adversary Proceeding.

The Debtor's Amended Schedule B lists personal property with an aggregate asserted value of $478,241.18. Of that value, $350,000 is attributed to a wraparound note and mortgage receivable on 2401 NE 37th Street, Fort Lauderdale, and $119,309 is attributed to a shareholder loan due to the Debtor from Eastside Development Corp. The Court is thus unable to ascertain from the record what property worth "several millions of dollars" is referred to in the Recusal Motion.

As discussed in Section 6(b) above, by Motion [ECF 219] filed August 1, 2013, the Trustee sought authority to enter into an Agreement (the "Settlement Agreement") with FPH. Under the Settlement Agreement, FPH agreed to pay $25,000 to the Trustee in order to fund the administration of this otherwise administratively insolvent estate. In exchange, FPH agreed to undertake the investigation and litigation of claims under Part V of the Bankruptcy Code (including preferences, fraudulent transfers, etc.), the Trustee agreed to retain FPH's counsel to handle potential litigation, and the parties agreed to a split of litigation recoveries 80% to FPH and 20% to the estate. The Settlement Agreement segregated out FPH's claims related to the property at 1241 Middle River Drive, Fort Lauderdale, and provided that FPH would have a continuing option "to purchase for $1 any asset or company in the Bankruptcy Estate that the Trustee determines will not cause the

18

Bankruptcy Estate more than a de minimis negative tax consequence upon sale."[12]

The Debtor objected [ECF 229] to the Settlement Agreement and separately objected [ECF 263, 265] to the sale of the estate's interest in the 1241 property. The objection to the Settlement Agreement was overruled and the Settlement Agreement approved by Order [ECF 257] entered October 16, 2013. The Debtor's objection to the sale of the 1241 property [ECF 263, 265] was overruled by Order [ECF 278] entered December 3, 2013. Contrary to the Debtor's assertion in the Recusal Motion, no notice of appeal addressed to either of these two Orders [ECF 257, 278] was filed and the Orders are now final. The Debtor's representation that a "District Court Appeal is pending on this matter" is not true.

## 6(f). The Court "permitted the debtor's homestead property to be sold for $1 to creditor FPH, etc."

In Adversary Proceeding 13-1246, discussed in part above, this Court determined that it was bound by the provisions of the *Rooker-Feldman* Doctrine by prior rulings in the Circuit Court for the Seventeenth Judicial Circuit, Broward County, Florida, in Case No.06-09583 (21), *FPH Properties LLC v. 22nd Century Properties, LLC and David Damerau.* The District Court, in Case No. 13-62262-CIV-MARRA, *David F. Damerau v. FPH Properties, LLC,* determined that this Court had erred in its conclusions and remanded the case for further proceedings. The Adversary Proceeding on remand is now before this Court, which conducted status conferences on October 1, 2014, and January 15, 2015. The Court now has the matter on remand under advisement.

The Debtor complains about two rulings in connection with this asserted basis for recusal. On November 16, 2014, the Debtor filed a Motion (the "Accounting Motion") [ECF 352] seeking

---

[12]The absence of tax returns for the Debtor's many entities was a continuing problem for the administration of the estate.

(a) an accounting from FPH as to its proceeds received from the sale of 1241 Middle River Drive; (b) an order directing FPH to place any such proceeds in the Registry of the Court; or, alternatively, (c) an order requiring FPH to post a bond for the value of the property sold (in an amount several hundred thousand dollars higher than the apparent actual sales price). FPH responded [ECF 365]. The Accounting Motion was heard January 15, 2015. In its response, FPH provided the requested accounting and opposed any order directing that proceeds be escrowed or that a bond be required.

The Court concluded that the request for an accounting was moot because an accounting had been provided, and that the request for proceeds to be escrowed or a bond be posted was premature, in that no determination had been made with respect to the issues to be dealt with on remand in Adv. Pro. 13-1246. Each of the cases relied upon by the Debtor which would have required such relief followed entry of a final judgment in favor of the party situated as the Debtor is in this case, either in the appellate court or on remand. No final judgment in favor of the Debtor was entered by the District Court and none has yet been entered by this Court. When asked[13] at the January 15th hearing if he was aware of any statutory, rule, or case authority that would require or even authorize the Court to impose a bond or escrow requirement while the case was pending on remand, the Debtor's counsel indicated that he was aware of no such authority. The Court is similarly unaware of any authority which would support the Debtor's request. The Court accordingly found by Order [ECF 371] entered January 26, 2015, that the request for an accounting was moot and that the additional relief sought by the Debtor was unavailable. The Debtor filed a Notice of Appeal [ECF 382] addressed to this Order. The Court believes that its Order was appropriate in the circumstances. It

_____

[13]No transcript of the January 15, 2015, hearing appears on the docket and there is no evidence on the docket that such a transcript has been ordered by any party.

20

was entered solely as a result of its consideration of the matters argued in open court.

## 6(g). The Court "fails to require [opposing counsel] to provide proper notice of any actions taken in the case."

The Debtor complains specifically about hearings conducted January 15, 2015, in connection with his Motion (the "Accounting Motion") [ECF 352] for an accounting. The Accounting Motion had originally been set for hearing on December 10, 2014, by Notice of Hearing [ECF 353] and continued by further Notice of Hearing [ECF 363] entered January 8, 2015. That Notice of Hearing was served electronically on all parties, including the Debtor's then-counsel, who receive service by CM/ECF. The Trustee's Motion (the "Turnover Motion") [ECF 354] for turnover by the Debtor of certain personal property, filed November 26, 2014, was noticed for hearing by Notice [ECF 359], entered December 2, 2014, and set the Turnover Motion for hearing January 15, 2015. This Notice was similarly served on Debtor's counsel by CM/ECF.

FPH filed its Response [ECF 365] to the Debtor's Accounting Motion [ECF 352] on January 13, 2015. Local Rule 5005-1(F)(1) provides that responsive pleadings "shall be filed and served so as to be received by the movant and the court not later than 4:30 p.m. on the second business day prior to the hearing, or the papers may not be considered at the hearing." FPH's Response was filed and served at 5:15 p.m. on January 13th, the second business day before the scheduled hearing on the Accounting Motion. This Court does not consider a 45 minute service delay to be material and the Debtor does not in any event indicate what prejudice, if any, he suffered as a result of the fact that FPH's response to his long-noticed Accounting Motion was 45 minutes tardy.

In this asserted ground for recusal, the Debtor refers to the Summary Judgment hearing held January 15, 2015, in Adv. Pro. 13-1246. The Debtor's Summary Judgment Motion [ECF 98] and

21

FPH's Summary Judgment Motion [ECF 14] had been noticed for hearing on January 15ᵗʰ by Order [ECF 102] entered November 26, 2015, continuing the Status Conference on remand. The Debtor had more than 7 weeks' notice of the Status Conference on the cross-motions for summary judgment, so it is difficult to tell what notice issues he is complaining about. The Debtor further represents in the Recusal Motion that "often rulings are made ex-parte and in secret unbeknownst to the debtor or other 3ʳᵈ parties who may have an interest." The Court has no idea what the Debtor is talking about.

## 6(h).   Refusal to allow the Debtor to confer with his attorney at the January 15ᵗʰ hearing.

Much of the hearing on January 15, 2015, was devoted to the *res judicata* and collateral estoppel issues which had been teed up by the Court's Order [ECF 102] entered November 26, 2014, in Adv. Pro. 13-1246. As discussed in Section 6(c) above, the parties had stipulated to certain issues [ECF 107] and FPH advanced [ECF 108] many other issues as to which it contended collateral estoppel applied so as to preclude further litigation on those issues in this Court. During the course of the colloquy between the Court and the Debtor's counsel, the Debtor repeatedly and loudly interrupted the Court and his own counsel, attempting to interject his own contrary contentions on various points which his counsel conceded were binding on this Court under principles of collateral estoppel. In the exercise of normal courtroom decorum, the Court directed the Debtor to stop his interruptions. There is as yet no transcript of the January 15ᵗʰ hearing which has been filed (or apparently ordered) in either the main bankruptcy case or in Adv. Pro. 13-1246. To the extent that the Court restricted the Debtor from consulting with his counsel during the course of that hearing, the Court regrets having done so and apologizes to the Debtor and his counsel. The Court is satisfied that its error was immaterial to the issues argued at that hearing and is further satisfied that its

22

exercise of its supervisory powers during the course of the hearing was motivated by a desire for the orderly administration of the case and not by any bias or prejudice against the Debtor.

\*\*\*

In addition to the asserted instances of bias outlined in Sections 6(a) to 6(h) above, the Debtor asserts in ¶ 8 of the Recusal Motion that the Court had refused to require FPH to post a bond at the Status Conference on January 15, 2015, and as he had requested in the Accounting Motion [ECF 352], denied by Order [ECF 371]. As discussed above in Section 6(f), there is no statutory, rule, or case authority for the proposition that a party situated as FPH is can be required to post a bond while the case is on remand. The Debtor juxtaposes that assertedly biased ruling by the Court with the terms of the Court's Order [ECF 54 in Adv. Pro. 13-1246] Granting Debtor's Motion for Stay Pending Appeal. The Debtor sought entry of a stay pending appeal by Motion [ECF 39]. As provided by Bankruptcy Rule 8005,[14] conditioning a stay pending appeal on the posting of a supersedeas bond to protect other parties in interest is entirely appropriate. The amount set here was \$250,000, and is appropriate in light of the value of the property. The propriety of a stay is "dependent upon the circumstances of the particular case," and the "traditional stay factors contemplate individualized judgments in each case." *Indiana State Police Pension Trust, et al., v. Chrysler LLC, et al.,* 556 U.S. 960, 961 (2009). The Supreme Court has also observed in a recent nonbankruptcy case that a stay pending appeal is an "intrusion into the ordinary processes of administration and judicial review," *Nken v. Holder,* 556 U.S. 418, 427 (2009). A stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* (citing *Virginian Ry. v. United States*, 272 U.S. 658, 672 (1926).

---

[14]Revised and renumbered as Bankruptcy Rule 8007 effective December 1, 2014.

23

On appeal before District Judge Marra in Case No. 0:13-cv-62262-KAM, the District Court

ruled [ECF 17]:

> As to the instant appeal, Appellant [the Debtor] sought and received a stay from the bankruptcy judge, conditioned upon his posting a bond in the amount of $250,000 [DE 8-1 at 7-8]. Appellant now asks this Court to stay the bankruptcy court's order granting summary judgment and final judgment in favor of Appellee without requiring a bond, or reducing the bond required by the bankruptcy court [DE 5 at 3]. This Court, having reviewed the file, finds that the bankruptcy judge's requirement for the posting of a bond in the amount of $250,000 was reasonable in light of the representation by the debtor in his schedules that the property was worth $1.6 million dollars [DE 8-1 at 5]. Appellant having failed to post the bond required by the bankruptcy court, this Court declines to grant Appellant's request.

There was nothing in this Court's decision to require the posting of a $250,000 supersedeas bond as a condition for a stay pending appeal which was inappropriate or reflective of any bias or prejudice against the Debtor.

In ¶ 9 of the Recusal Motion [ECF 380], the Debtor contends that this Court "was clearly not acting in a fair and impartial manner" by virtue of the fact that the District Court reversed this Court's grant of summary judgment in favor of FPH in Adv. Pro. 13-1246. The very purpose of the appellate process is to allow courts not confronted with the day-to-day actions in a case to consider carefully and dispassionately the rulings made by trial courts. If a trial judge were required to recuse whenever a case is reversed and remanded for further proceedings, the federal courts would soon clog: Every complex case would have to be reassigned at the trial court level to a judge with no background knowledge or familiarity with the relevant facts. Recusal is simply not required in this situation.

In ¶ 10 the Recusal Motion [ECF 380], the Debtor contends that the Court's denial of his Motion [ECF 322] to Remove and Disqualify the Trustee's Special Counsel demonstrates that the

Court "acted with personal bias against the Debtor and unreasonable [sic] denied this request even though the parties had been in vexious [sic] litigation for over 7 years." The Debtor did not appeal from the Order approving Settlement Agreement, the Order authorizing the sale of properties from the Trustee to FPH, or the Order appointing Special Counsel. In approving the appointment of Special Counsel under 11 U.S.C. § 327(e), the Court found that there was no actual conflict between the estate and FPH. Under applicable law, only the existence of "actual conflict" precludes the employment by a trustee of special counsel. *In re AroChem Corp.,* 176 F.3d 610, 624 (2d Cir. 1999). Special counsel was appointed in this case to handle litigation claims to recover assets for the theretofore insolvent estate. The refusal to remove Special Counsel reflects no bias or prejudice against the Debtor, and the Debtor is fully entitled to pursue his appeal from the Order [ECF 333]. That appeal is now pending in the District Court as Case No. 0:14-cv-61983-JIC.

In ¶ 11 of the Recusal Motion, the Debtor reiterates his unhappiness with the denial of his Motion for an accounting [ECF 352], denied by Order [ECF 371] and discussed in Section 6(f) above. To the extent that this alleged basis for recusal applies to "the other properties" that were sold to FPH by the Trustee, see Section 6(e) above. The Debtor did not appeal from the Orders [ECF 257, 278] which authorized the sale of "the other properties" and 1241 Middle River Drive.

In ¶ 12 of the Recusal Motion, the Debtor complains that the Court failed to act at the hearing on August 8, 2014, when the Debtor raised complaint about actions taken by FPH's counsel in entering into a stipulation with the Internal Revenue Service which, according to the Debtor, could have had a significant adverse tax consequence on him. On June 20, 2014, the IRS and FPH entered into a Stipulation [ECF 312] regarding the IRS's tax lien on 1241 Middle River Drive, Fort Lauderdale. That Stipulation was withdraw by Notice of Withdrawal [ECF 313], filed June 26,

25

2014. As of the hearing on August 8, 2014, the issues created by the Stipulation were moot. In light of the mootness of the issue, the Court is unable to determine how the Court "abused his discretion, and acted prejudicially" toward the Debtor in connection with this issue.

In ¶ 13 of the Recusal Motion, the Debtor reiterates matters regarding tax returns discussed in Section 6(d) above. The Court did find the Debtor to be in contempt for failure to file tax returns by Order [ECF 350] entered November 6, 2014. Contrary to the Debtor's assertion that he was "ordered to pay Attorney's fees to Special Council/FPH [sic]," no such order has ever been entered and no sanctions have been imposed against the Debtor for his failure to file tax returns.

In ¶ 14 of the Recusal Motion, the Debtor reiterates his complaint that the Court had sanctioned Mr. Harris $1,000 and called him a chump. This issue is fully discussed in Section 6(b) above and no further discussion is warranted.

## Conclusion

The Debtor seeks recusal of this Court under 28 U.S.C. §§ 144, 455(b), and 455(a). Section 144 does not apply to bankruptcy judges. No facts showing actual bias or personal knowledge within the meaning of § 455(b) have been alleged. As discussed above, no reasonable, well-informed, thoughtful and objective person with knowledge of all of the surrounding facts and circumstances of this contentious case could reasonably conclude that this Court was biased or prejudiced against the Debtor or in favor of the Trustee or FPH. No showing of an appearance of bias or prejudice has been made, let alone a showing of a favorable or unfavorable predisposition "so extreme as to display clear inability to render fair judgment," *Liteky,* 510 U.S. at 551. Accordingly, it is **ORDERED** that the Recusal Motion [ECF 380, 381] is **DENIED.**

###

26